**Gregory Bockin** (*pending pro hac vice*)
**Samantha Williams** (*pending pro hac vice*)
**Jacqueline O'Reilly** (*pending pro hac vice*)
**S. Yael Berger** (*pending pro hac vice*)
**Attorneys for Plaintiff**
**U.S. SECURITIES AND EXCHANGE COMMISSION**
100 F Street, NE
Washington, DC 20549
Phone: (202) 551-5684 (Bockin)
Email:  bocking@sec.gov

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **UNITED STATES SECURITIES AND EXCHANGE COMMISSION** | |
| Plaintiff, | **Civil Action No.** |
| vs. | **Jury Trial Demanded** |
| **EMIL BOTVINNIK** | |
| Defendant. | |

## COMPLAINT

Plaintiff United States Securities and Exchange Commission, for its Complaint against Defendant Emil Botvinnik alleges as follows:

## SUMMARY

1. From June 2012 to November 2014, Botvinnik, then a registered representative at a broker-dealer based in New York City, engaged in a fraud involving excessive trading in the accounts of his retail customers that generated substantial commissions to enrich himself while his customers experienced significant losses.

2. Botvinnik solicited at least five customers to open securities trading accounts at

the firm where he was employed and assured them that he would employ a profitable trading strategy on their behalf. Botvinnik recommended a strategy to these customers involving frequent, short-term trades, while charging them costly commissions and fees for each trade. The frequency of Botvinnik's trading, coupled with the commissions and fees on every trade, made it almost certain that his customers would lose money from this strategy. Indeed, the customers' investments would need to achieve annual returns of approximately 31% to 150% just to pay for the transaction costs associated with Botvinnik's recommendation.

3. Botvinnik was required to have a reasonable basis to believe his trading strategy was suitable for the customers to whom he recommended it. In fact, Botvinnik did not have a reasonable basis to believe that the frequent level of trading he recommended to customers, given the significant costs imposed on them, would be suitable for them or anyone else. Botvinnik also engaged in fraudulent and deceptive conduct by executing certain trades in customers' accounts without first obtaining their approval or informing them of material facts about the trading strategy he recommended, as required for non-discretionary accounts.

4. Botvinnik violated the antifraud provisions of the federal securities laws by: (a) recommending an investment strategy to his customers without a reasonable basis to believe it was suitable for investors; (b) making materially false and misleading statements to customers regarding the strategy; and (c) engaging in unauthorized trading.

5. Botvinnik's fraudulent acts resulted in approximately $2.7 million in losses for the customers and $3.7 million in ill-gotten gains for Botvinnik.

## **VIOLATIONS**

6. By engaging in the conduct alleged herein, the Defendant, directly or indirectly, violated, and unless restrained and enjoined will violate again, Section 17(a) of the Securities Act

of 1933 ("Securities Act") [15 U.S.C. § 77q(a)], Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## JURISDICTION AND VENUE

7. The Commission brings this action pursuant to authority conferred by Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Section 21(d)(1) of the Exchange Act [15 U.S.C. § 78u(d)(1)], seeking a final judgment: (1) restraining and permanently enjoining the Defendant from engaging in the acts, practices and courses of business alleged against him herein; (b) ordering the Defendant to disgorge all ill-gotten gains and to pay prejudgment interest on those amounts; and (c) imposing civil money penalties on the Defendant pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

8. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, Section 22(a) of Securities Act [15 U.S.C. § 77v(a)], and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa]. The Defendant, either directly or indirectly, has made use of the means or instrumentalities of interstate commerce, of the mails, of the facilities of national securities exchanges, and/or the means or instruments of transportation or communication in interstate commerce in connection with the acts, practices, and courses of business alleged herein.

9. Venue lies in the Southern District of New York pursuant to 28 U.S.C. §1391(b)(2), Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)], and Section 27 of the Exchange Act [15 U.S.C. § 78aa]. Certain of the offers and sales of securities and acts, practices, transactions, and courses of business alleged in this complaint occurred within the Southern District of New York. Specifically, Botvinnik's violations took place while he was

acting as a registered representative associated with Meyers Associates, LP, a broker-dealer located in New York City, commission payments from Meyers to Botvinnik were initiated in the Southern District of New York, trades were initiated through Meyer's trading desk in the Southern District of New York, and trades were executed on exchanges based in the Southern District of New York, and were effected, directly or indirectly, by making use of means or instrumentalities of transportation or communication in interstate commerce, or the mails, or the facilities of national securities exchange.

## DEFENDANT

10. **Botvinnik**, age 38, a resident of Coral Gables, Florida, worked as a registered representative associated with Meyers Associates, LP (later known as Windsor Street Capital, LP) from June 2012 through November 2014. Botvinnik has worked at 11 different brokerage firms during his 13 years in the securities industry and holds Series 7 and 63 licenses.

## RELATED ENTITY

11. **Meyers Associates, L.P. ("Meyers")**, a New York limited partnership with its principal place of business in New York, NY, has been registered with the Commission as a broker-dealer since 1993. In December 2016, Meyers changed its name to Windsor Street Capital, LP. In May 2018, FINRA expelled Meyers from FINRA membership, and consequently the securities industry, after Meyers failed to comply with the terms of a prior SEC order, SEC Rel. No. 33-10392 (July 28, 2017).

## FACTS

12. From June 2012 to November 2014, Botvinnik defrauded at least five customers by recommending an investment strategy that, due to the substantial commissions he charged, was certain to lose money unless his trading earned highly improbable gains.

13. In 2012 and 2013, Botvinnik and a colleague cold-called potential customers using leads from a publicly-available database to solicit them to open securities trading accounts at Meyers.

14. After successfully soliciting five customers, Botvinnik caused accounts to be opened at Meyers in their names on or around the following dates:

| Customer | Account Opening Date |
|---|---|
| Customer 1 | 08/07/2013 |
| Customer 2 | 06/18/2012 |
| Customer 3 | 05/29/2013 |
| Customer 4 | 10/14/2013 |
| Customer 5 | 10/09/2013 |

Customers 1 through 5 funded these accounts with money for investment.

**Botvinnik's Trading Strategy of Frequent, Short-Term Trading**

15. For each of Customers 1 through 5, Botvinnik recommended the same trading strategy of short-term investments involving frequent purchases and sales of securities, sometimes referred to as "in-and-out" trading. During the dates specified below, Botvinnik employed this strategy with the money invested by Customers 1 through 5:

| Customer | Trading Dates |
|---|---|
| Customer 1 | 08/22/2013 – 12/23/2013 |
| Customer 2 | 06/26/2012 – 04/04/2014 |
| Customer 3 | 05/29/2013 – 04/11/2014 |
| Customer 4 | 10/24/2013 – 07/16/2014 |
| Customer 5 | 10/09/2013 – 06/02/2014 |

5

16. Botvinnik charged Customers 1 through 5 commissions or markups/markdowns and other fees on a trade-by-trade basis. Because the customers incurred costs with every transaction, making a profit depended upon the price of the security increasing during the brief period that the security was held in the customer's account.

17. Botvinnik charged Customers 1 through 5 commissions and fees on losing trades as well as profitable trades. Botvinnik personally set the amounts of the commissions, and had an agreement with Meyers to receive 90% of the commissions that he generated for Meyers.

18. Botvinnik caused Customers 1 through 5 to hold each of the securities that he recommended they purchase for an average of 6.7 days before selling.

19. Turnover and cost-to-equity ratios are industry metrics used to measure whether activity in brokerage accounts is excessive. Turnover is the number of times per year a customer's securities are replaced by new securities. The cost-to-equity ratio, also referred to as the break-even ratio, measures the amount the value of the securities in an account has to appreciate annually just to cover trading costs. An annual turnover of 6 or more, or a cost-to-equity ratio of 20% or more, are generally considered to be indicators of excessive trading.

20. During the relevant period, the annualized turnover and cost-to-equity ratios for the accounts that Botvinnik managed for Customers 1 through 5 were extremely high and indicative of excessive trading. Customer 1 had a cost-to-equity ratio of 104.0% and an annualized turnover rate of 17.0. Customer 2 had a cost-to-equity ratio of 45.7% and an annualized turnover rate of 106.2. Customer 3 had a cost-to-equity ratio of 150.3% and an annualized turnover rate of 26.9. Customers 4 and 5 had cost-to-equity ratios of 31.0% and 64.9%, respectively, and annualized turnovers of 5.8 and 9.3.

21.     The average annualized cost-to-equity ratio for Botvinnik's five customers was 51.5%. In other words, due to the significant costs associated with the trading strategy Botvinnik recommended, the securities in his customers' accounts had to increase in value by an average of 51.5% a year, just for the customer to realize a single dollar of profit.

22.     Due to Botvinnik's recommended trading strategy, Customers 1 through 5 paid a total of approximately $5.1 million in commissions, mark-ups, mark-downs, and other trading costs during the brief period their accounts were open. As reflected in the chart below, which includes the turnover and cost-to-equity figures for their accounts, Customers 2 through 4 each lost hundreds of thousands of dollars as a result of Botvinnik's recommended trading strategy:

| | Account / Customer | Account Analysis Time Period | Gain (Loss) | Annual Cost / Equity Ratio | Annual Equity Turnover | Average Equity | Total Costs |
|---|---|---|---|---|---|---|---|
| 1 | Customer 1 | 08/01/2013 – 04/30/2014 | $6,998 | 104.0% | 17.0 | $143,008 | $110,849 |
| 2 | Customer 2 | 06/01/2012 – 04/30/2014 | ($1,141,943) | 45.7% | 106.2 | $4,395,015 | $3,839,597 |
| 3 | Customer 3 | 05/01/2013 – 05/31/2014 | ($517,138) | 150.3% | 26.9 | $301,564 | $490,527 |
| 4 | Customer 4 | 10/01/2013 – 11/30/2014 | ($402,693) | 31.0% | 5.8 | $1,062,083 | $383,686 |
| 5 | Customer 5 | 10/01/2013 – 11/30/2014 | ($666,926) | 64.9% | 9.3 | $420,996 | $318,358 |
| | **ACROSS ACCOUNTS** | **06/01/2012 – 11/30/2014** | **($2,721,702)** | **51.5%** | **91.7** | **$3,995,400** | **$5,143,017** |

**Botvinnik Had a Duty to Have a Reasonable Basis for Recommended Trading**

23.     Botvinnik owed a duty to his customers to have a reasonable basis for any investment strategy he recommended. This meant that, at a minimum, he needed to understand

7

whether the costs associated with his strategy would exceed any potential investment gains.

24.     Meyers's policies and procedures, which were in effect during the relevant period and applied to Botvinnik, described this obligation: "[Registered Representatives] must have a reasonable basis for believing that a recommended transaction or investment strategy involving a security or securities is suitable for the customer." Botvinnik personally received Meyers's procedures.

**Botvinnik Made Recommendations With No Reasonable Basis**

25.     As alleged above, Botvinnik was required to have a reasonable basis to believe that his trading strategy was suitable for the customers to whom he recommended it. Before making any recommendations to customers, he was required to take steps to ensure that he understood the potential risks and rewards of any trading recommendation.

26.     As previously noted, Botvinnik was informed of his obligation to have a reasonable basis for his trading recommendations by Meyers's written supervisory procedures.

27.     Botvinnik did not take reasonable steps to determine whether his recommended in-and-out trading strategy was suitable for Customers 1 through 5, given the associated high trading costs.

28.     Since the customers incurred trading costs with every transaction, making a profit depended upon the price of the security increasing during the brief period the security was held in the customer accounts. The increase in price had to exceed the combined costs for even a minimal profit to be realized. The impact of the costs associated with the excessive trading, however, made it virtually certain that customers would not earn even a minimal profit.

**Botvinnik Made Materially False and Misleading Statements to Customers**

29.     In communications with Customers 1 through 5 about their accounts, Botvinnik represented to each of them that his trading strategy would be profitable.

30. In addition, because Botvinnik had an obligation to ensure that trades he recommended were suitable for the customer, he implicitly represented that he had a reasonable basis for the trading strategy when he recommended it to Customers 1 through 5.

31. Both Botvinnik's explicit and implicit representations to Customers 1 through 5 were false because, given the high trading costs and frequent level of trading, Botvinnik's strategy was highly unlikely to be profitable and was not suitable for any investor.

32. Botvinnik knew or was reckless in not knowing that generating even a minimal profit from his trading strategy depended on price increases of the stocks greater than the commissions, markups, markdowns, and other fees that he was charging the customers. Since the investments he recommended to Customers 1 through 5 were held on average for less than seven days before being sold, any price increases were almost always negated by the associated transaction costs of buying and selling the securities. Indeed, the customers' investments would have had to achieve annual returns of approximately 31% to 150% just to cover the trading costs associated with Botvinnik's recommendation.

33. Botvinnik's false and misleading statements were material. The profitability of a recommended trading strategy is a matter of importance to a reasonable investor.

**Botvinnik Acted with Scienter**

34. Botvinnik knew or was reckless in not knowing that the trading strategy or level of trading he recommended was unsuitable for Customers 1 through 5 because their transaction costs were virtually certain to exceed profits.

35. Botvinnik personally benefitted when he recommended his unsuitable trading strategy to Customers 1 through 5 because he reaped large profits from trading costs charged on a trade-by-trade basis, while his customers suffered significant losses. The more frequently these

customers traded, the more profits Botvinnik acquired. During the period from June 2012 to November 2014, Botvinnik obtained approximately $3.7 million in compensation based on the commissions and other costs he charged Customers 1 through 5 for the unsuitable trading strategy he recommended.

36. In addition, Botvinnik's scienter is evidenced by steps he took to conceal significant transaction costs associated with his recommended level of trading. As described below, Botvinnik did this by charging larger trading costs in circumstances where the trading fees would not be obvious to the customer.

37. When a brokerage firm acts as an agent for a securities trade, *i.e.*, brokers the transaction between its customer and a third party, the trading cost is generally a commission calculated as a percentage of the value of the securities traded. When a brokerage firm acts as a principal for a securities trade, *i.e.*, transacts with its customer with securities from the firm's own inventory, the trading cost is generally a mark-up (for a purchase) or a mark-down (for a sale) to the price of the security being traded.

38. Meyers sent Customers 1 through 5 trade confirmations containing details of their trades. Trade confirmations for agency trades reflect the total amount of the commission charged as a separate line item. Trade confirmations for principal trades, however, reflect mark-ups or mark-downs on a per share basis; to determine the total costs of executing the trade, the customer needs to complete an additional calculation.

39. Botvinnik determined, on a trade-by-trade basis, whether to execute the trade on an agency or principal basis and the amount to charge the customer in commission, mark-up, or mark-down. For example, Botvinnik charged Customers 1 through 5 larger transaction costs when trades were executed on a principal basis and total costs were less obvious, than he did in

10

commissions on agency trades.

**Botvinnik Engaged in Unauthorized Trading**

40. Botvinnik also engaged in deceptive conduct by trading on behalf of one customer without obtaining the customer's approval or informing the customer of material facts about the trading such as what securities Botvinnik was purchasing or selling and in what quantities.

41. All of the accounts managed by Botvinnik were non-discretionary, meaning that Botvinnik was required to obtain customer authorization prior to each transaction.

42. Botvinnik obtained customer authorizations for trades through phone calls with his customers. As a result, a phone call between the customer and Botvinnik needed to occur before any trade.

43. Telephone and trading records reflect a number of instances where Botvinnik did not call Customer 2 prior to executing trades for his account. Upon information and belief, these trades were unauthorized.

44. The chart below illustrates examples of dates where, upon information and belief, unauthorized trading occurred for Customer 2:

| Customer | Date | Number of Trades |
|---|---|---|
| Customer 2 | 2/24/2014 | 15 |
| | 2/25/2014 | 4 |
| | 2/26/2014 | 7 |
| | 2/27/2014 | 2 |
| | 2/28/2014 | 3 |
| | 3/5/2014 | 1 |

**FIRST CLAIM FOR RELIEF**
**Violations of Section 17(a) of the Securities Act**

45. The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 44, as if fully set forth herein.

46. The Defendant, directly or indirectly, in the offer or sale of securities and by the

use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, has: (a) employed devices, schemes, or artifices to defraud; (b) obtained money or property by means of untrue statements of a material fact or omissions of a material fact necessary in order to make the statement made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon purchasers of securities and upon other persons.

47. While engaged in the conduct described above, the Defendant acted knowingly, recklessly, or negligently.

48. By reason of the foregoing, the Defendant, directly or indirectly, has violated, and unless enjoined, will again violation Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## SECOND CLAIM FOR RELIEF
**Violation of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder**

49. The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 44, as if fully set forth herein.

50. The Defendant, directly or indirectly, in connection with the purchase or sale of securities and by the use of the means or instrumentalities of interstate commerce or of the mails, or of the facilities of a national securities exchange, has: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statement made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

51. While engaged in the conduct described above, the Defendant acted knowingly or recklessly.

52. By reason of the foregoing, the Defendant, directly or indirectly, has violated, and unless enjoined, will again violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## **PRAYER FOR RELIEF**

**WHEREFORE**, the Commission respectfully requests that this Court enter a Final Judgment:

**I.**

Finding the Defendant liable for the violations alleged herein;

**II.**

Permanently enjoining the Defendant from committing, aiding and abetting or otherwise engaging in conduct that would make them liable for the violations of the federal securities laws alleged in this complaint.

**III.**

Ordering the Defendant to disgorge any ill-gotten gains and to pay prejudgment interest on those amounts.

**IV.**

Ordering the Defendant to pay civil monetary penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

**V.**

Retaining jurisdiction over this action to implement and carry out the terms of all orders and decrees that may be entered.

**VI.**

Granting such other and further relief as the Court may deem just and proper.

## **JURY DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands trial by jury in this action of all issues so triable.

Dated: September 7, 2018

Respectfully submitted,

By: /s/ Gregory Bockin
Gregory R. Bockin
Samantha Williams
S. Yael Berger
Jacqueline O'Reilly
U.S. Securities and Exchange Commission
100 F. Street, N.E.
Washington, D.C. 20549
Tel: (202) 551-5684 (Bockin)
Email: BockinG@sec.gov